# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

HANI S. TADROS,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )   No. 10 C 7074
                                   )
MICHAEL J. ASTRUE,                 )   Magistrate Judge Finnegan
Commissioner of Social Security,   )
                                   )
            Defendant.             )

## MEMORANDUM OPINION AND ORDER

Plaintiff Hani Tadros brings this action under 42 U.S.C. § 405(g), seeking to overturn

the final decision of the Commissioner of Social Security ("Commissioner") denying his

application for disability insurance benefits under Title II of the Social Security Act.  The

parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28

U.S.C. § 636(c).  Plaintiff subsequently filed a "Motion to Reverse and Remand the

Commissioner's Decision," which this Court construes as a motion for summary judgment

seeking reversal of the Administrative Law Judge's decision.  After careful review of the

parties' briefs and the record, the Court now grants Plaintiff's motion and remands the

matter solely for fuller consideration of evidence from Dr. Monif Matouk.

## PROCEDURAL HISTORY

Plaintiff applied for disability insurance benefits on January 3, 2008, alleging that he

became disabled beginning on June 8, 1998 due to headaches, carpal tunnel syndrome,

and problems with his back, neck, and upper extremities.  (R. 9, 12, 185).  The Social

Security Administration denied the application initially on April 11, 2008, and again on

reconsideration on July 9, 2008.  (R. 9, 98-102, 107-110).  Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Jose Anglada held an administrative hearing on August 10, 2009, where he heard testimony from Plaintiff, who appeared with counsel, and a vocational expert.  (R. 9-18).  On October 27, 2009, the ALJ found that Plaintiff is not disabled because he is capable of performing a significant number of jobs available in the national economy.  (R. 9-18).  The Appeals Council denied Plaintiff's request for review on September 3, 2010.  (R. 1-3).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.  Plaintiff advances three main grounds for reversal. He argues that the ALJ improperly discounted or disregarded medical evidence in making a finding on Plaintiff's residual functional capacity.  He also asserts that the ALJ erred in determining that he could perform his past work where the vocational expert had testified otherwise and where such work was found not to be substantial gainful activity.  Finally, Plaintiff contends that the ALJ incorrectly assessed the weight to be given to his chiropractor's opinion.

## **FACTUAL BACKGROUND**

Plaintiff was born on July 15, 1957, and was 46 years old as of his date last insured ("DLI") of September 30, 2003.  (R. 11, 16).  He is a high school graduate and is able to communicate in English.  (R. 16).  His past relevant work experience was as a property manager.  (*Id.*).

## A.  Plaintiff's Medical History

### 1.  Neck and Back Injuries and Carpal Tunnel Syndrome

The record in this matter shows a history of complaints by Plaintiff of pain in his neck, back, and right arm, elbow, and hand dating back to the late 1990s and continuing through the DLI of September 30, 2003.  According to documentation prepared for Plaintiff's disability insurance providers[1] by Michael Hausch, D.C., of Midwest Chiropractic Care Center, Plaintiff first presented himself for chiropractic treatment on December 3, 1999 complaining of "a history of neck pain with radiation into the right upper extremity as well as an intervertebral disc herniation at the C6/C7 level."  (R. 389).  Dr. Hausch's notes from that date indicate that Plaintiff complained of foot pain, lower neck pain radiating into the right shoulder, upper back pain, and headaches.  (R. 407, 408).  Dr. Hausch recommended a 12-week treatment plan followed by "supportive care," and referred Plaintiff for physical therapy.  (R. 392, 409-410).

Plaintiff underwent MRIs of the brain and cervical spine on June 29, 2000 after complaining of "headaches," "right hand numbness," and a "[t]wo-year history of neck pain." (R. 239-240).  The brain MRI suggested some parenchymal (functional) volume loss and no evidence of lesions, which was consistent with a brain CT exam Plaintiff underwent in 1991.  (R. 239).  The spine MRI showed "[n]o evidence of cord abnormality," "extensive degenerative disc disease" at C3-C4, and "a herniated disc . . . with some flattening and dorsal displacement of the cord" at C4-C5.  (R. 239).  Plaintiff underwent another head CT

---

[1]  A substantial portion of the record consists of documentation prepared and submitted by Dr. Hausch to Plaintiff's insurance providers in support of Plaintiff's disability claims over the course of many years.

on July 19, 2001 after complaining of a headache due to "head trauma." (R. 238). The results were "unremarkable" as there was "no evidence of hemorrhage, edema, mass effect, or cortical infarction" and no fluid collection or swelling. (R. 238). Dr. Hausch's daily notes indicate that he saw Plaintiff on nine occasions in 2000 and ten occasions in 2001, with a progress assessment of slow or none, except on three occasions where it was worse due to headaches. (R. 501-519).

Plaintiff was subsequently involved in three separate car accidents in February 2002, May 2002, and January 2003. (R. 333-336). Medical records indicate that Plaintiff presented himself for chiropractic treatment from Dr. Hausch on February 25, 2002, following a February 23, 2002 car accident, and again on May 20, 2002, following a May 18, 2002 car accident. (R. 303). In February 2002, Plaintiff complained of a constant dull ache, burning, numbness, and tingling in his neck and lower back radiating to his right arm and hand, which worsened with physical activity. (R. 344-346). MRIs of his right and left elbows in April 2002 showed some inflammation but otherwise indicated intact and unremarkable ligaments and tendons and no evidence of lesions. (R. 348, 349). Plaintiff continued to see Dr. Hausch approximately weekly until his May 2002 car accident, showing "no change" in symptoms and "slow" progress. (R. 351-356).

During a May 20, 2002 examination by Dr. Hausch two days after the second car accident, Plaintiff complained of constant tension, burning, numbness, tingling and stiffness in his neck radiating to his right hand and left elbow, which worsened when bending, lifting, or applying pressure to the elbow and improved when resting or applying ice. (R. 288, 303). On June 4, 2002, a physical therapist in Dr. Hausch's office recommended a treatment plan of stretching, range of motion, and "modalities" as needed three times per

week for eight weeks, noting that Plaintiff "would benefit from being seen for McKenzie protocol,[2] posture training, stretching [and] cervical ROM." (R. 308). Plaintiff received chiropractic treatment approximately weekly with Dr. Hausch from May through mid-August 2002, and approximately monthly from September 2002 until his third car accident in January 2003, during which time Dr. Hausch again assessed his symptoms as showing "no change" and his progress as "slow." (R. 311-327). The treatment notes indicate that on several occasions in 2002 Dr. Hausch advised Plaintiff to consult an orthopedist (R. 311, 312, 313), and that Plaintiff told Dr. Hausch he underwent surgery for carpal tunnel syndrome of his right hand in June 2002. (R. 315, 316). There is no direct medical evidence in the record of any such hand surgery.

Plaintiff was involved in a third car accident on January 18, 2003. (R. 335-336). Records from Christ Hospital show that Plaintiff was seen by an emergency physician shortly after the accident complaining of "neck pain, L[eft] arm weakness (no paresthesias), bil[ateral] knee pain and T/L spinal pain." (R. 361). The hospital records indicate that he had a "normal" evaluation, "including CT neck/head/chest and body xrays," and that he showed no signs of distress or motor weakness. (R. 366, 367-370). Although additional tests were recommended, the hospital notes state that Plaintiff "refuse[d] tests and reports he will see his doctor" and "signed out AMA [against medical advice]." (R. 366). He left the hospital that same day with instructions to follow up with his primary doctor and to return if he experienced increased pain, numbness, or weakness, or if his condition worsened.

---

[2] According to the website of The McKenzie Institute International, the McKenzie Method is "a philosophy of active patient involvement and education . . . for back, neck and extremity problems." The McKenzie Institute International, http://www.mckenziemdt.org (last visited July 21, 2011).

(R. 363-364). There is no documentation indicating that Plaintiff followed up with a medical doctor, however three days after the accident, Plaintiff saw Dr. Hausch complaining of neck, elbow, and hand pain. (R. 325). He resumed his approximately weekly appointments through February 2003, during which time he continued to show "slow" progress and no change in his symptoms. (R. 325-327, 337-343, 522-523).

Also in January and February 2003, Plaintiff underwent several MRIs. An MRI of his left elbow showed "[n]o significant intrinsic bone, joint, or soft tissue abnormalities," and an MRI of his right elbow showed a "[s]mall amount of fluid . . . in the elbow joint," an "intact" ulnar collateral ligament, and "normal" biceps, triceps, and brachialis tendons. (R. 330, 331). An MRI of his cervical spine showed a "small right paracentral herniation" at C4-C5; "[n]oncompressive protrusions" at C3-C4, C5-C6, and C6-C7; and a spinal cord of "normal caliber and signal intensity." (R. 332). Presumably at Plaintiff's request, Dr. Hausch informed American Trans Air, by letter dated March 31, 2003, that Plaintiff's "medical condition" would prevent him from using an airline ticket he purchased but that he would be "physically able to travel" upon completion of treatment approximately 60 days later. (R. 418). Plaintiff saw Dr. Hausch on two more occasions – in May and July 2003 – prior to his DLI of September 30, 2003. (R. 524-525).

After the DLI, Plaintiff continued to seek treatment for the same conditions. Dr. Hausch's daily notes indicate that he saw Plaintiff four times in 2004, four times in 2005, and four times in 2006, and that Plaintiff showed slow or no progress during that time. (R. 465-466, 486-489, 490-492, 526-529). An MRI in October 2006 showed "[e]xtensive degenerative changes throughout the cervical spine, worse at the level of C3-4 where there is moderate central canal stenosis and severe bilateral lateral recess narrowing." (R. 496).

In July 2007, Plaintiff was involved in yet another car accident, and during an evaluation by Dr. Hausch a couple days later he complained of headaches and neck pain radiating to the arms and hands. (R. 563-566). Plaintiff saw Dr. Hausch ten more times in 2007 and thirteen times in 2008, during which time Dr. Hausch generally assessed his condition as "unchanged" and/or "chronic" and his progress as "slow." (R. 612-634). An assessment from Dr. Hausch dated two months prior to the hearing in August 2009 stated that Plaintiff "has permanent problems including but not limited to cervical spine intervertebral disc injuries, and cervical radiculitis," and concluded that "his physical capabilities are therefore limited." (R. 644).

## 2. Podiatrist's Assessment

The record contains a letter to Plaintiff's attorney, dated a week prior to the administrative hearing in August 2009, from Monif M. Matouk, DPM, a podiatrist associated with Midwest Orthopaedic Consultants, stating that he has "known [Plaintiff] for many years and [has] treated him for a variety of musculoskeletal issues of the Lower Extremities." (R. 639-641). The record contains no medical records, tests, notes or supporting documentation of any kind from Dr. Matouk. In his letter, Dr. Matouk stated that Plaintiff "has a history of severe degenerative joint disease affecting his feet, ankles, knees, lumbar spine and neck." (R. 639). He stated that Plaintiff's "foot condition causes severe pain and edema with prolonged standing or ambulation, in most cases less than half an hour," and that Plaintiff's "ankle joint range of motion and subtalar joint range of motion are significantly decreased." (*Id*.). He further stated that Plaintiff suffers from "peripheral neuropathy" (nerve damage) that makes him "more prone to instability and therefore frequent injuries," including "several ankle sprains" for which he was treated. (*Id*.). Dr.

Matouk also opined on various aspects of Plaintiff's condition that are unrelated to podiatry and for which he did not treat Plaintiff, including assertions concerning a brain aneurysm, arthritis of the cervical spine, nerve entrapment in the upper extremities, migraine headaches, anxiety and depression, post-traumatic stress disorder, and sleep apnea. (R. 640-641). He conceded that he "ha[s] not treated [Plaintiff] personally except for his Lower Extremity problems," but noted that he "had a chance to review [Plaintiff's] past medical history and discuss it with him in detail." (R. 641).

### 3. Migraines, Depression, and Vision Problems

In addition to the musculoskeletal problems described above, Plaintiff testified at the administrative hearing that he is impaired in his ability to work due to migraine headaches, depression, and vision problems. (R. 33, 47). As noted above, Plaintiff complained of migraines to his chiropractor, Dr. Hausch, and to his podiatrist, Dr. Matouk. However there is no documentation in the record that Plaintiff sought treatment for migraines from anyone other than Dr. Hausch. There also is no documentation in the record that Plaintiff was diagnosed with depression or sought treatment for depression or any other psychological or mental conditions from any health care provider, therapist, or counselor.

On November 29, 2001, Plaintiff was examined at the University of Chicago Hospitals for complaints of "mild right eye pain status post assault, which he sustained on 11/15/01." (R. 246). The report noted that Plaintiff previously was assaulted and suffered nasal fractures in the early 1990s, which were repaired surgically in 1990 and 1991. (*Id*.). A CT scan in November 2001 revealed a "focal defect" that was "small and minimally displaced," and "was most likely an old fracture" that "do[es] not require surgical intervention." (*Id*.) The clinic notes state that Plaintiff reported "no visual problems" and

"no complaint of double vision or blurry vision and he states that he is back to his normal daily activities." (*Id.*) There is no other medical documentation in the record concerning eye or vision problems.

### 4. Agency Reviewing Physicians

On April 10, 2008, Dr. Francis Vincent completed an initial Request for Medical Advice for the Bureau of Disability Determination Services ("DDS"). (R. 534-36). Dr. Vincent concluded that there was insufficient evidence of any impairment or related functional limitations for the relevant time period. (R. 536). On July 8, 2008, Dr. Barry Free completed a Request for Medical Advice for DDS upon reconsideration. (R. 537-39). Dr. Free affirmed Dr. Vincent's determination that there was insufficient evidence of any impairment (R. 538-39).

## B. Plaintiff's Testimony

At the hearing before the ALJ on August 10, 2009, Plaintiff testified that he last worked in June 2000 as a self-employed property manager for apartments owned by him and his father-in-law. (R. 29-30). Plaintiff later stated that he stopped working in 1998 due to migraine headaches, carpal tunnel syndrome, and vision problems. (R. 33, 35). He testified that between 1990 and 1998, he was able to work only intermittently doing part-time, light duty work such as office work and paperwork due to carpal tunnel in his hands and neck problems. (R. 37).

Plaintiff described his three separate car accidents in 2002 and 2003 in which he suffered injuries to his neck and back. (R. 38-44). He did not identify his injuries from the first incident in February 2002, in which his car was struck by another car, although he testified that he did not go to the emergency room and was not hospitalized. (R. 39-40).

In May 2002, his car was again struck by another car. (R. 40). He was not hospitalized, but went to an "urgent care" facility where he was treated and told to follow up with his own doctor. (R. 41). He testified generally that he suffered no fractures or new injuries, but that he aggravated old injuries, including injuries to his neck. (*Id.*). In January 2003, Plaintiff was again involved in a car accident, and this time he was taken by ambulance to the hospital. (R. 43). He testified that his new van was "smashed completely" and that he "was unconscious." (*Id.*). He claimed that he was hospitalized for "a couple of days"[3] and later saw a neurologist due to bad migraines and pain in his neck and back. (R. 44). He also stated that he was diagnosed with "a tear on [his] knee" after the accident, which limits his ability to lift and use stairs. (R. 62). After he was discharged, Plaintiff underwent physical therapy and took pain medication. (R. 45). He stated that he was told he could undergo neck surgery "to repair all the discs," which "might [cause it to] get better and it might even get worse," or he could manage the pain with medication, which is the course of action he took. (*Id.*). He stated that he continues to experience pain and numbness, which has increased since the January 2003 car accident. (R. 53).

Plaintiff also testified that he suffers from carpal tunnel syndrome in his right hand, for which he underwent surgery in 2002 and again in 2003. (R. 53-54). He stated that the surgery helped briefly, but then his symptoms worsened, and his doctors advised him against further surgeries. (R. 54-55). In addition, he testified that he has suffered from migraine headaches[4] since 2000 or 2002, and that since 2003 they have continued to occur

---

[3]    Medical records from Christ Hospital show that he was discharged the same day he presented in the emergency room. (R. 363-364).

[4]    Plaintiff noted in passing that he was diagnosed with a brain hemorrhage in December 2007 (R. 32-33), although he did not indicate whether the brain hemorrhage was related

three or four times per week. (R. 55-58). To treat his migraines, he takes prescription amitriptyline[5] and extra-strength Tylenol, and uses ice bags on his head and under his pillow. (R. 45, 58-59). Plaintiff testified that he first took amitriptyline for depression after his brother was killed in August 2002, and that the dosage was increased after his January 2003 car accident. (R. 45-46). He testified that even if he was physically capable of working, his depression would prevent him from doing so. (R. 46-47).

Finally, Plaintiff also testified about a 1990 robbery at the store where he worked during which he was struck in the face with a steel pipe, breaking his nose and causing vision problems. (R. 34-36). He was non-specific about the nature of his vision problems, stating only that he uses glasses to drive at night and sometimes drives with glasses during the day. (R. 34). He testified that he did not wear glasses to drive to the hearing. (*Id.*).

In terms of his physical impairments, Plaintiff testified that between June of 1998 and September 2003, he could lift at most five pounds, walk a half block, stand for five minutes, sit for 15-20 minutes, and had difficulty bending. (R. 48-49, 60). He also indicated that during this time he was taking medication to control his high cholesterol level and that his cardiologist had advised him to lose weight, which he has been unable to do. (R. 48-49). He stated that he spends most of his time at home sitting, reading, and watching TV, and

---

to the migraines. In any event, the brain hemorrhage occurred more than four years after the DLI.

[5]     According to the National Center for Biotechnology Information, a division of the National Library of Medicine at the National Institutes of Health, amitriptyline "is used to treat symptoms of depression," however it may be prescribed for other uses, including "to prevent migraine headaches." PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000666/ (last visited July 21, 2011).

only leaves home to attend church on Sundays.  (R. 49-50).  He testified that since 2003 he can go only one or two hours without pain in his neck and shoulders and he can no longer do paperwork without assistance.  (R. 60, 61-62, 63).

## C.     Vocational Expert's Testimony

Thomas Dunleavy testified at the hearing as a vocational expert ("VE").  (R. 9).  He characterized Plaintiff's prior work as a property manager as semi-skilled with light exertion. (R. 65-69).  The ALJ then described a hypothetical individual of Plaintiff's age, education, and past work experience who can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; can stand or walk no more than two hours in an eight-hour work day; can do no repetitive bending, overhead reaching, pushing, or pulling to the limit of what he can lift and carry; and has a mild inability to concentrate for extended periods due to pain and discomfort.  (R. 69-70).  The VE testified that while he could not perform Plaintiff's prior job of property manager, such an individual could perform the requirements of other representative jobs available in the regional economy, such as assembler (4,000 jobs), sorter (2,200 jobs), or cashier (2,000 jobs).  (R. 17, 70-71).

The ALJ next modified the hypothetical to add the following additional limitations: can lift and carry no more than five pounds occasionally; can stand no longer than five minutes at a time; can walk no more than half a block at a time; can sit no more than 20 minutes at a time; and can bend only occasionally.  (R. 71).  The VE testified that such a person could perform the same jobs he listed previously but that they would be available in reduced numbers – assembler (3,000 jobs), sorter (1,000), and cashiers (2,000) – to account for the need to sit more frequently.  (R. 71-72).

**D.     ALJ's Decision**

In his written decision, the ALJ found that Plaintiff was not disabled prior to the date last insured of September 30, 2003. (R. 18). In applying the five-step sequential analysis required by 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff was not engaged in substantial gainful activity between the alleged onset date of June 8, 1998 and the DLI. (R. 11). At Step 2, he then determined that Plaintiff's discogenic and degenerative spinal disorders constitute severe impairments. (R. 12). However, at Step 3, the ALJ determined that none of these impairments met or medically equaled any of the listed impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 12-13). Proceeding to Step 4, he concluded that Plaintiff retains the residual functional capacity to perform light work involving frequently lifting and/or carrying 10 pounds; occasionally lifting and/or carrying 20 pounds; and sitting, standing or walking for about two hours in an eight-hour workday. (R. 13). The ALJ determined that other limitations include "no repetitive bending, repetitive overhead reaching, and no repetitive pushing/pulling to the limits he can lift and/or carry." (*Id.*)

In reaching this determination, the ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible" to the extent they are inconsistent with the residual functional capacity (RFC) finding. (R. 14). Of particular note, the ALJ observed that Plaintiff "never sought or received treatment from a specialist; all treatment has been rendered by a chiropractitioner." (*Id.*) The ALJ also found it significant that in March 2003 Plaintiff's chiropractor "cleared [him] to be able to physically travel" on an airplane, "suggest[ing] that the alleged symptoms and limitations may have been overstated." (*Id.*)

13

With respect to the medical evidence, the ALJ described the findings of MRIs of Plaintiff's cervical spine performed in June 2000 and January 2003 and MRIs of his right and left elbows performed in January and February 2003, respectively, although he did not explain what conclusions he drew from this evidence, which included both normal and abnormal findings. (R. 15). With respect to opinion evidence, the ALJ noted that he gave consideration to "the reports of the state agency medical consultants as well as to other treating, examining, and non-examining medical sources." (*Id.*) While noting that opinions of non-examining physicians, such as the agency consultants, do not generally deserve as much weight as those of examining or treating physicians, the ALJ determined that the opinions of the DDS reviewing physicians "do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions." (*Id.*) He noted that those opinions "also support a finding of 'not disabled.'" (*Id.*)

The ALJ also examined opinion evidence submitted by Plaintiff's chiropractor, Dr. Hausch, which asserted that Plaintiff had been unable to work. (R. 15). The ALJ prefaced his analysis by pointing out that the opinion of a medical source that a claimant is "disabled" or "unable to work" is not dispositive, since that determination "is reserved for the Commissioner." (*Id.*) He also noted that "chiropractors are not considered acceptable medical sources" under 20 C.F.R. § 404.1513, but that their opinions may be considered "to show the severity of [Plaintiff's] impairment(s) and how it affects [Plaintiff's] ability to work." (*Id.*) The ALJ then went on to state that his conclusion that Plaintiff is not disabled is supported by Dr. Hausch's statement that Plaintiff "returned to work on June 1, 2000" and his statement in November 2003 that Plaintiff "was capable of performing light office work with limited standing, walking, and sitting." (R. 15, 16).

14

Relying on the vocational expert's testimony, the ALJ then concluded that Plaintiff is capable of performing his past relevant work as a property manager or, in the alternative, there are other jobs that exist in sufficient numbers in the national economy that Plaintiff can perform, given his age, education, work experience, and RFC. (R. 16). Accordingly, the ALJ found that Plaintiff was not disabled as of the date last insured. (R. 17).

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). A "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons).

**B.      Disability Standard**

A claimant who can establish he is "disabled" as defined by the Social Security Act, and was insured for benefits when his disability arose, is entitled to disability insurance benefits.  42 U.S.C. §§ 423(a)(1)(A), (E); *see also Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009).  "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382a(3)(A).  An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy.  *Id.* at § 423(d)(2)(A). Gainful employment is "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).

In order to determine whether a claimant is disabled, the ALJ conducts a standard five-step inquiry, set forth in 20 C.F.R. § 404.1520(a)(4), which requires the ALJ to consider in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals one of a list of specific impairments enumerated in the regulations; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is able to perform other work in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled."  *Id.* (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)); *see also* 20 C.F.R. § 404.1520(a)(4).

16

**C.     Analysis**

In his motion, Plaintiff makes three main arguments for reversal, asserting that the ALJ erred by (1) discounting or disregarding medical evidence and VE testimony in making a finding on Plaintiff's residual functional capacity, (2) determining that Plaintiff could perform his past work where the VE had testified otherwise and where such work was found not to be substantial gainful activity, and (3) incorrectly assessing the weight to be given to the opinion of Plaintiff's chiropractor.  This Court is not persuaded by the majority of Plaintiff's arguments, but finds that Plaintiff successfully presents grounds for reversal as to the evidence from his podiatrist, Dr. Matouk.  Accordingly, for the reasons set forth below, this Court remands the matter to the Commissioner for further proceedings.

**1.     The RFC Finding**

Plaintiff makes various arguments challenging the ALJ's finding of his residual functional capacity (RFC).  In essence, he asserts that the ALJ:  (a) erroneously discounted Plaintiff's carpal tunnel symptoms based on a purported factual misapprehension that the sole carpal tunnel evidence was from Plaintiff's chiropractor; (b) made a finding concerning Plaintiff's upper extremity limitations that is contrary to the evidence and the VE's testimony; (c) ignored statements from Plaintiff's podiatrist, Dr. Matouk; (d) disregarded statements from Dr. Hausch and Dr. Matouk that Plaintiff is limited to part-time work; and (e) failed to include any limitations due to depression.

In order to determine at Steps 4 and 5 of the analysis whether the claimant can perform his past relevant work and/or adjust to other work, respectively, the ALJ must first assess the claimant's RFC, which is defined as the most the claimant can do despite his limitations.   *See* 20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR")

96–8p, 1996 WL 374184, *2.  This requires an ALJ to consider all functional limitations and restrictions that stem from medically determinable impairments, including those that are not severe.  *See* SSR 96–8p, 1996 WL 374184, *5.  An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions.  *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Berger*, 516 F.3d at 544.

As discussed below, Plaintiff has shown that the ALJ failed to logically connect the evidence only as to the statements from Dr. Matouk concerning Plaintiff's limitations related to his foot and ankle conditions, therefore remand is appropriate for consideration of that evidence.  As to the other deficiencies Plaintiff asserts, however, there is substantial evidence to support the findings in the RFC.

### a.    Carpal Tunnel Syndrome

Plaintiff first argues that the ALJ committed a "factual error" by "discount[ing] [Plaintiff's] carpal tunnel symptoms" in the RFC finding on the grounds that all of the treatment Plaintiff received was "from a chiropractor and that he had never sought or received treatment from a specialist."  (Pl. Mem., at 9-10).  Specifically, while Plaintiff concedes that "most" of the evidence consists of records from his chiropractor, he asserts that the ALJ disregarded evidence that Plaintiff "had been treated by an orthopedic specialist and a neurologist, had had an EMG, and had undergone surgery for carpal tunnel syndrome (R. 54, 302, 303, 305, 447, 463, 639-41)."  (*Id.*).  This argument is unavailing because the record is devoid of any direct medical evidence of carpal tunnel syndrome, and the only reference to the syndrome consists of second-hand statements from Plaintiff's chiropractor and podiatrist, neither of whom are acceptable medical sources for purposes of establishing that Plaintiff is impaired in this respect.

18

It is Plaintiff's burden to prove that he was disabled on or before the DLI. *Pulli v. Astrue*, 643 F. Supp. 2d 1062, 1075 (N.D. Ill. 2009) (citing *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997)). An impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [claimant's] statements of symptoms." 20 C.F.R. § 404.1508. Although the ALJ will consider all the claimant's symptoms in determining whether he is disabled, including statements from the claimant, treating or nontreating sources, and others, those statements alone cannot establish a disability. *Id.* at § 404.1529(a). Rather, "there must be medical signs and laboratory findings which show that [claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . ., would lead to a conclusion that [claimant is] disabled." *Id.*;[6] *see also* SSR 96-7p, 1996 WL 374186, *1, 2. Moreover, evidence from an "acceptable medical source" is required to establish an impairment. 20 C.F.R. § 404.1513(a); *see also* SSR 06-03p, 2006 WL 2329939, *2. A licensed podiatrist is an acceptable medical source "for purposes of establishing impairments of the foot, or foot and ankle only." 20 C.F.R. § 404.1513(a)(4). A chiropractor is not an acceptable medical source, but rather is an "other source" which "may" be used only to show the severity of an impairment and how it affects one's ability to work. *Id.* at § 404.1513(d).

---

[6] "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [claimant's] statements (symptoms)" and "must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 404.1528(b). "Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable diagnostic techniques," including chemical tests, electrophysiological studies, and x-rays. *Id.* at § 404.1528(c).

Here, because there is no medical evidence of carpal tunnel syndrome from acceptable medical sources, Plaintiff cannot establish an underlying medical impairment of carpal tunnel syndrome from which his symptoms derive. Indeed, Plaintiff does not cite to any direct medical evidence from an orthopedic specialist, neurologist, or surgeon, nor does the record contain such evidence. Rather, each piece of purportedly disregarded evidence cited by Plaintiff is either a statement from Plaintiff himself that he underwent surgery (R. 54) or second-hand statements from non-acceptable medical sources, namely Plaintiff's chiropractor (R. 302, 303, 305, 447, 463) and podiatrist (R. 639-41), concerning treatment Plaintiff allegedly received from other treating sources. Plaintiff claims to suffer from carpal tunnel syndrome in his right hand, not his feet or ankles, and therefore his podiatrist, Dr. Matouk, is not an acceptable medical source for the purpose of establishing this impairment. Likewise, the evidence from Plaintiff's chiropractor, Dr. Hausch, is insufficient to establish an impairment since a chiropractor is not an acceptable medical source. Thus, for example, although Plaintiff asserts that an EMG in June 2002 establishes a diagnosis of mild right carpal tunnel syndrome (R. 15), the only evidence that an EMG was performed is Dr. Hausch's second-hand representations in a letter to Plaintiff's disability insurer concerning the purported EMG results. (R. 302). The EMG results themselves are not in the record, nor does the record contain any evidence from an acceptable medical source who performed or interpreted the EMG or any other clinical diagnostic tests or laboratory findings. There also is no evidence from a surgeon or other acceptable medical source confirming Dr. Hausch's assertions to Plaintiff's disability insurers that Plaintiff underwent surgery for carpal tunnel syndrome on his right wrist. (R. 305, 447, 463). The two cases cited by Plaintiff are inapposite because they involve ALJs

who disregarded medical evidence from acceptable medical sources, which is not the situation here.  *See  Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Prak v. Chater*, 892 F.Supp. 1081, 1087 (N.D. Ill. 1995).

Because the evidence at issue is not medical evidence from an acceptable medical source, it cannot serve as the basis for establishing an impairment out of which Plaintiff's symptoms arise.  Accordingly, to the extent the ALJ may have given little or no weight to Plaintiff's assertion that he suffered from carpal tunnel syndrome, it does not constitute a basis for reversal or remand.

### b.    Upper Extremity Limitations

Plaintiff next argues that the ALJ's RFC finding is contrary to the evidence and the VE's testimony about Plaintiff's upper extremity limitations.  At Step 4 of the analysis, the ALJ concluded that Plaintiff retains the RFC to perform light work involving frequently lifting and/or carrying 10 pounds; occasionally lifting and/or carrying 20 pounds; and sitting, standing or walking for about two hours in an eight-hour workday.  (R. 13).  The ALJ also determined that other limitations include "no repetitive bending, repetitive overhead reaching, and no repetitive pushing/pulling to the limits he can lift and/or carry."  (*Id.*)

Plaintiff makes several arguments on this point.  He first asserts that the ALJ erred because Plaintiff "cannot use his hands repetitively at all."  (Pl. Mem., at 11-12).  But the evidence to which he cites, and presumably any evidence concerning Plaintiff's ability to use his hands, is related to his alleged carpal tunnel syndrome.  As discussed above in Section C.1.a, there is no medical evidence from an acceptable medical source to establish any underlying impairment of carpal tunnel syndrome.  Thus, the ALJ was not required to consider the chiropractor's statements concerning carpal tunnel-related limitations in

determining the RFC.  In any event, the chiropractor's statements are contradictory, and therefore minimally useful, as he states that Plaintiff has limited ability to use his hands and cannot do highly repetitive activities, yet at the same time he states that Plaintiff is capable of performing light office work.  (R. 427, 433, 441, 442, 463).

Plaintiff also argues that the ALJ improperly "accepted" some limitations, but "rejected" others without explanation, concerning "repetitive upper extremity movements, e.g. reaching, pushing, pulling." (Pl. Mem., at 12).  But the RFC clearly imposes restrictions on these activities by specifying that there be "no repetitive bending, repetitive overhead reaching, and no repetitive pushing/pulling to the limits [Plaintiff] can lift and/or carry." (R. 13).  Plaintiff offers no explanation as to how these RFC limitations are insufficient or otherwise fail to take into account the relevant evidence concerning Plaintiff's upper extremity limitations.

Finally, Plaintiff challenges the ALJ's conclusion that he possesses the RFC to perform the other jobs identified by the VE at Step 5 since those jobs require the ability to frequently handle up to two pounds bilaterally.  But Plaintiff again cites no evidence showing that he is incapable of such activity.  In fact, between 2001 and 2004, Dr. Hausch stated on multiple occasions that Plaintiff can lift up to 15 or 20 pounds, and never specified that he was unable to lift two pounds.  (R. 373, 399, 420, 426, 427, 461, 462, 463).

In sum, Plaintiff has cited no evidence or legal authority to show that the upper extremity limitations in the RFC are not supported by substantial evidence.

### c.    Dr. Matouk's Statements

Plaintiff next argues that the ALJ erred by ignoring statements set forth in a letter from Plaintiff's podiatrist, Dr. Matouk, describing Plaintiff's various health problems.  As

noted above, a licensed podiatrist is an acceptable medical source "for purposes of establishing impairments of the foot, or foot and ankle only." 20 C.F.R. § 404.1513(a)(4). Therefore, Dr. Matouk is an acceptable medical source solely for the purpose of establishing that Plaintiff suffers from impairments related to his feet and ankles. The letter from Dr. Matouk opines on a wide range of Plaintiff's purported ailments that are unrelated to podiatry, including a brain aneurysm, arthritis of the cervical spine, nerve entrapment in the upper extremities, migraine headaches, anxiety and depression, post-traumatic stress disorder, and sleep apnea. (R. 640-641). Because these conditions are beyond the scope of Dr. Matouk's qualifications as an acceptable medical source, he cannot be the basis for establishing these impairments. Thus, the ALJ did not err by disregarding Dr. Matouk's opinions as to these conditions.

But Dr. Matouk also opined on certain conditions and limitations that are within his purview as a podiatrist, which the ALJ failed to address in formulating the RFC. Dr. Matouk wrote that Plaintiff "has a history of severe degenerative joint disease affecting his feet, [and] ankles . . ." (R. 639). More specifically, he stated that Plaintiff's "foot condition causes severe pain and edema with prolonged standing or ambulation, in most cases less than half an hour," and that Plaintiff's "ankle joint range of motion and subtalar joint range of motion are significantly decreased." (*Id.*). He further stated that Plaintiff suffers from "peripheral neuropathy" (nerve damage) that is "mostly manifested in the lower extremities" and which makes him "more prone to instability and therefore frequent injuries," including "several ankle sprains" for which he was treated. (*Id.*). The thirty-minute standing/walking limitation advanced by Dr. Matouk falls well within the five-minute standing and half-block walking limitations that the ALJ presented to the VE in a hypothetical, and for which the VE

23

concluded there were sufficient jobs that Plaintiff could perform. (R. 71-72). But the ALJ did not consider the other limitations voiced by Dr. Matouk, namely Plaintiff's "significantly decreased" ankle and subtalar (foot) joint range of motion and Plaintiff's nerve-damaged induced "instability" on his feet. (R. 639). While it is possible these limitations can be accounted for by other restrictions the ALJ presented to the VE in his hypotheticals – such as the restrictions concerning standing/walking, weight-lifting, bending, and reaching – this Court cannot know if this is the case because the ALJ never acknowledged Dr. Matouk's letter or its contents. *See* SSR 96-8p, 1996 WL 374184, *5 ("The RFC assessment must be based on *all* of the relevant evidence in the case record . . . .") (emphasis in original); *see also Alexander v. Astrue*, No. 09 C 3406, 2010 WL 3199356, at *10 (N.D. Ill. Aug. 10, 2010) ("The ALJ must examine the entire record to construct an RFC and confront evidence that does not support his determination.")

In sum, the factual record simply is not developed sufficiently for this Court to reach any conclusion. The record is entirely devoid of any treatment notes, medical records, or other documentation from Dr. Matouk. Moreover, Dr. Matouk's letter, which was written nearly six years after the DLI, does not specify the time frame of any assessment, diagnosis, or course of treatment, merely stating that Dr. Matouk "ha[s] known [Plaintiff] for many years and ha[s] treated him for a variety of musculoskeletal issues of the Lower Extremities." (R. 639). Accordingly it is impossible for this Court to determine whether these alleged impairments produced symptoms that are unaddressed in the RFC, or even whether the impairments arose before the DLI. To the extent Dr. Matouk's letter was insufficient to allow the ALJ to determine if Plaintiff had any foot or ankle limitations or whether Plaintiff was disabled prior to the DLI, the ALJ was obligated to contact Dr. Matouk

by mail or telephone for clarification. *See* 20 C.F.R. § 404.1512(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.") The ALJ's failure to do so in this instance leaves this Court unable to assess whether the RFC adequately addresses any limitations related to Plaintiff's foot and ankle conditions. This error is not harmless because SSR 96-8p provides that "[i]n assessing RFC, the [ALJ] must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) . . . ." 1996 WL 374184, *7. By omitting any mention, let alone discussion, of Dr. Matouk's statements regarding Plaintiff's instability and reduced foot and ankle range of motion, the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion that Plaintiff is capable of employment.

### d.    Part-Time Work

Plaintiff also argues that the ALJ erred by failing to "address the evidence limiting [Plaintiff] to part-time work," which Plaintiff contends "is not substantial gainful activity." The sole authority Plaintiff cites for the assertion that part-time work is not substantial gainful activity is Social Security Ruling 96-8p, but SSR 96-8p says no such thing. In fact, the only mention of part-time work in SSR 96-8p is a footnote which states that a person who retains the RFC to perform his past relevant part-time work is not disabled if the part-time work was substantial gainful activity. *See* 1996 WL 374184, *8 n.2. Moreover, the regulations explicitly state that "work may be substantial even if it is done on a part-time

basis . . ."  20 C.F.R. § 404.1572(a); *see Ladd v. ITT Corp.*, 148 F.3d 753, 754 (7th Cir. 1998) ("As long as the worker can engage in 'substantial gainful activity,' he is not disabled even if the only work that he is capable of doing is part time.") (citing *Brewer v. Chater*, 103 F.3d 1384, 1391-92 (7th Cir. 1997), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999)); *see also Liskowitz v. Astrue*, 59 F.3d 736, 744-46 (7th Cir. 2009) (rejecting argument that VE was required to identify percentage of part-time jobs among those claimant was capable of performing; rather claimant may rebut VE's testimony with evidence that jobs identified are not "substantial gainful work").  The law simply does not support Plaintiff's blanket assertion that part-time work cannot be substantial gainful activity.

Plaintiff further asserts that the ALJ erred by failing to include in the RFC the part-time work limitation proposed by Dr. Matouk and Dr. Hausch.  The August 2009 letter from Dr. Matouk does indeed opine that Plaintiff is capable only of part-time work.  (R. 641).  However, as discussed above in Section C.1.c, the vast majority of Dr. Matouk's comments concern purported impairments well beyond his scope of expertise as a podiatrist and acceptable medical source.  *See* 20 C.F.R. § 404.1513(a)(4).  Dr. Matouk concedes as much, noting that he "ha[s] not treated [Plaintiff] personally except for his Lower Extremity problems," and that his opinion is based on his "review" of Plaintiff's medical history and his discussions with Plaintiff.  (R. 641)  He then goes on to state that "considering his past and current medical history, I would have to agree that at no time since at least 2002 has [Plaintiff] been capable of more than part time work, at best."  (*Id.*)  It is not clear with whom Dr. Matouk "agrees" – whether Plaintiff or Dr. Hausch – but in any event the letter makes clear that his opinion concerning the part-time work limitation is based on the totality of

Plaintiff's "past and current medical history" as set forth in the letter, which encompasses numerous conditions that are outside his scope as an acceptable medical source, for which he did not treat Plaintiff, and which are not limited to the time period prior to the DLI. *See Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008) (finding no error where ALJ discounted evidence that post-dated the DLI and which did not support contention that plaintiff was disabled prior to the DLI).

Dr. Hausch likewise asserts that Plaintiff is limited to part-time work, but he makes this assertion in documents to Plaintiff's disability insurers dated several years after the DLI and referring only to a time period after the DLI (R. 551, 600, 607, 643). Significantly, in a document dated August 21, 2003 – a little more than a month before the DLI of September 30, 2003 – Dr. Hausch stated that Plaintiff was unable to work in his own occupation from June 1998 through April 8, 2002, but that Plaintiff was able to return to work full-time as of April 8, 2002 subject to the restrictions of light office work only, no lifting in excess of 15 pounds, and no highly repetitive activities. (R. 433). The ALJ was not obligated to consider evidence that post-dates the DLI, particularly here where the evidence immediately prior to the DLI establishes Plaintiff's ability to work full-time subject to restrictions that the ALJ included in the RFC. *See Eichstadt*, 534 F.3d at 667.

Accordingly, for these reasons the ALJ did not err by not including a part-time work limitation in the RFC.

### e.     Depression

Finally, Plaintiff argues that the RFC is deficient because it "does not include limitations due to psychological conditions," namely Plaintiff's "depression, for which [Plaintiff] was taking medication." (Pl. Mem., at 12-13). As an initial matter, Plaintiff argues

in passing that the ALJ should have determined that Plaintiff has a severe mental impairment, but this argument is unavailing due to the complete lack of any medical evidence of depression or any other psychological condition from an acceptable medical source. *See* 20 C.F.R. § 404.1513(a) (stating that evidence from an "acceptable medical source" is required to establish an impairment). Dr. Matouk's statement that Plaintiff "bec[a]me depressed" after his brother was killed (R. 640) is insufficient to establish this impairment since, as noted above, Dr. Matouk is a podiatrist and therefore not an acceptable medical source for the purpose of establishing any impairments other than those of the feet and ankles. *See* 20 C.F.R. § 404.1513(a)(4).

Plaintiff next asserts that the ALJ was required to include psychological limitations in the RFC based on his finding at Step 3 of the analysis that Plaintiff "had moderate difficulties . . . [w]ith regard to concentration, persistence or pace." (R. 13). The ALJ does not specify upon what evidence he based the conclusion that Plaintiff had such difficulties, and the only evidence in the record appears to be Plaintiff's hearing testimony that he was depressed due to his brother's death and was in pain due to his ailments, which caused him to be "impatient." (R. 46-47, 62-64). But, in any event, Plaintiff misses the point. The RFC assessment "considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, 1996 WL 374184, *1. Here, the ALJ found no medically determinable mental impairment, so there was no requirement to consider mental limitations in devising the RFC. Nonetheless, each hypothetical scenario that the ALJ presented to the VE included the assumption that the claimant "has a mild inability to maintain attention and concentration for extended periods due to pain and

discomfort." (R. 69-70, 71). Thus, any error is harmless since Plaintiff's difficulties with maintaining attention and concentration were indeed taken into consideration by the VE and the ALJ in determining at Step 5 of the analysis whether there are jobs Plaintiff could perform.

In conclusion, with the exception of certain evidence identified above from the Plaintiff's podiatrist, Dr. Matouk, the ALJ's RFC assessment is supported by substantial evidence. As to the statements from Dr. Matouk, the ALJ failed to acknowledge or address the limitations Dr. Matouk identified related to Plaintiff's foot and ankle problems. Accordingly, the matter must be remanded to the ALJ for consideration of this medical evidence in determining the Plaintiff's RFC.

### 2.     Plaintiff's Ability to Perform His Past Work

Plaintiff next argues that the ALJ erred in determining at Step 4 of the analysis that he is not disabled because he can perform his past work, even though the VE testified that a person with Plaintiff's limitations could not perform Plaintiff's past work and the ALJ previously found at Step 1 that Plaintiff's past work was not substantial gainful activity.

If a claimant is able to engage in substantial gainful activity, the Commissioner will find that he is not disabled. 20 C.F.R. § 404.1571. "Generally, in evaluating [a claimant's] work activity for substantial gainful activity, [the Commissioner's] primary consideration will be the earnings [claimant] derive[s] from the work activity." *Id.* at § 404.1574(a)(1). The regulations set forth a formula for calculating the monthly earning threshold for work to constitute substantial gainful activity. *Id.* at § 404.1574(b)(2).

In this case, Plaintiff is correct that the VE testified that someone with Plaintiff's limitations would be unable to perform Plaintiff's past work as a property manager. (R. 69-

70).  Plaintiff also correctly observes that the ALJ mistakenly stated that the VE testified that such an individual *could* resume Plaintiff's prior work.  (R. 16).  In addition, Plaintiff is correct that the ALJ determined that his past work as a property manager was not "substantial gainful activity" since his earnings in 2000 and 2001 were below the monetary threshold necessary to establish the performance of substantial gainful activity under 20 C.F.R. § 404.1574.  (R. 11).  Thus, the ALJ erred in concluding that Plaintiff is not disabled on the ground that he could return to his prior work as a property manager.  However, the error makes no difference in the final disability determination because the ALJ concluded in the alternative that there were jobs in the national and regional economy in sufficient numbers to which Plaintiff could successfully adjust.  (R. 16-17).  Thus, the ALJ's error at Step 4 is harmless because he continued on in the sequential analysis and his alternative finding at Step 5 is sufficient to substantiate his determination that Plaintiff is not disabled.  *See Ziegler v. Astrue*, 336 F. App'x 563, 570-71 (7th Cir. 2009) (finding harmless ALJ's factually unsupported determination at Step 4 that plaintiff could perform past work where ALJ made alternative finding at Step 5 that plaintiff could perform other jobs that exist in significant numbers); *Tommasetti v. Astrue*, 533 F.3d 1035, 1042-43 (9th Cir. 2008) (same); *Cadenhead v. Astrue*, No. 05 C 3929, 2010 WL 5846326, *12-13 (N.D. Ill. Mar. 5, 2010) (finding harmless any error the ALJ may have committed in not adhering to the law of the case at Steps 1 or 2 since ALJ found at Step 4 that plaintiff could perform her past work which was substantial gainful activity).

Accordingly, because the ALJ's error in concluding Plaintiff could perform his past work was harmless, it does not provide a basis for reversal or remand.

### 3.    The Chiropractor's Opinion

Finally, Plaintiff argues generally that the ALJ erred in discounting the opinion of his chiropractor, Dr. Hausch, concerning his limitations.   Plaintiff acknowledges that a chiropractor is not an "acceptable medical source" under the regulations, but contends that the ALJ incorrectly assessed the weight to be given to Dr. Hausch's opinion.   Plaintiff argues that the weight to be given to other sources such as chiropractors depends upon "various factors, including the length and frequency of the source's contact with the claimant, the consistency of the source's opinion with other evidence, the degree to which the source explains or presents relevant evidence to support an opinion, and whether the source has expertise related to the individual's impairment(s)."  (Pl. Mem., at 14, citing SSR 06-03p).   Based on these factors, Plaintiff contends that the ALJ should have given "significant weight" to Dr. Hausch's opinion concerning Plaintiff's "functional limitations" since Dr. Hausch treated Plaintiff "over a period of nearly ten years," he "examined [Plaintiff] multiple times," and the record contains detailed reports from Dr. Hausch, including "findings made during clinical examinations and explanations of [Plaintiff's] condition."  (Pl. Mem., at 14-15).

An ALJ need not accord the same weight to a chiropractor's opinion as he does to that of a physician.  The Commissioner "need[s] evidence from acceptable medical sources to establish whether [claimants] have a medically determinable impairment(s)," however chiropractors are not encompassed by any of the five categories of professionals who constitute "acceptable medical sources."  20 C.F.R. § 404.1513(a).  Rather, chiropractors are among the "other sources" from which the Commissioner "may also use evidence . . . to show the severity of [claimant's] impairment(s) and how it affects [claimant's] ability to

work." *Id.* at § 404.1513(d)(1). Thus, an ALJ "has greater discretion when weighing the opinions of 'other sources,' including chiropractors," as "the presumption of controlling weight does not apply to chiropractors." *Mulvaney v. Barnhart*, No. 05 C 4439, 2006 WL 2252547, *21 (N.D. Ill. Aug. 3, 2006) (citation omitted) (finding that ALJ did not commit error in declining to give controlling weight to chiropractor's RFC assessment); *see also Humphries v. Apfel*, No. 99 C 1200, 2000 WL 574536, *5-6 (N.D. Ill. May 10, 2000) (same). Social Security Ruling 06-03p specifies the factors an ALJ should consider in determining the weight to give to evidence from "other sources" such as chiropractors. They are: (i) how long the source has known and how frequently the source has seen the individual; (ii) how consistent the opinion is with other evidence; (iii) the degree to which the source presents relevant evidence to support an opinion; (iv) how well the source explains the opinion; (v) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (vi) any other factors that tend to support or refute the opinion. SSR 06-03p, 2006 WL 2329939, *4-5. It is a fact-specific inquiry, and "[n]ot every factor for weighing opinion evidence will apply in every case." *Id.*

In this case, there is considerable evidence from Dr. Hausch, supported by MRIs of Plaintiff's cervical spine, indicating that Plaintiff suffers from chronic pain in his neck and back. After considering the evidence, the ALJ concluded that Plaintiff retains the RFC to perform light work involving frequently lifting and/or carrying 10 pounds; occasionally lifting and/or carrying 20 pounds; and sitting, standing or walking for about two hours in an eight-hour workday, and further specified that Plaintiff do "no repetitive bending, repetitive overhead reaching, and no repetitive pushing/pulling to the limits he can lift and/or carry." (R. 13). The RFC appears to be entirely consistent with Dr. Hausch's statements about

Plaintiff's limitations, so it is unclear what exactly Plaintiff believes the ALJ disregarded in formulating the RFC. Plaintiff's brief does not identify any specific deficiencies, other than the exclusion of limitations for his carpal tunnel symptoms and a restriction to part-time work only. (Pl. Mem., at 15). As discussed in detail in Sections C.1.a and C.1.d, these arguments related to carpal tunnel symptoms and part-time work are unavailing.

In the ALJ's discussion of the RFC, he referenced two items from the record concerning Dr. Hausch. After acknowledging that he may consider the chiropractor's opinions to show the severity of Plaintiff's impairments and how it affects Plaintiff's ability to work, he first noted that, contrary to Dr. Hausch's statement that Plaintiff was unable to work, Plaintiff returned to work on June 1, 2000. (R. 15, citing R. 464). This evidence pre-dates the DLI by more than three years, and also pre-dates the three car accidents in 2002 and 2003 that aggravated Plaintiff's back and neck conditions, thus significantly diminishing its usefulness as an indicator of Plaintiff's limitations at the time of the DLI. Next, the ALJ referenced Dr. Hausch's opinion of November 11, 2003 that Plaintiff was capable of performing "light office work with limited standing, walking and sitting" and noted that this opinion "is supported by the other substantial medical evidence." (R. 16). Although this statement post-dates the DLI by approximately six weeks, it is consistent with the other statements from Dr. Hausch in the several years prior to the DLI. In particular, it is consistent with Dr. Hausch's statement on August 21, 2003 – a little more than a month before the DLI – that Plaintiff had been physically able to return to work full-time as of April 8, 2002, subject to the restrictions of light office work only, no lifting in excess of 15 pounds, and no highly repetitive activities. (R. 433). Indeed, the record is replete with statements from Dr. Hausch between 2000 and 2003, consistent with the limitations in the RFC, that

33

Plaintiff can perform light clerical work, can lift 10-20 pounds, and cannot do repetitive activity. (R. 373, 399, 420, 426, 427). To the extent Plaintiff intended to challenge the RFC limitation that Plaintiff can "occasionally" lift 20 pounds, there is ample documentation from Dr. Hausch after the DLI indicating improvement in Plaintiff's lifting ability, such that he could lift up to 20 pounds in 2002, 2003, and 2004. (R. 461, 462, 463, 608). In any event, any error in this respect would be harmless since the hypothetical posed to the VE, and upon which the ALJ based his conclusion at Step 5 that Plaintiff could work, limited lifting to only "five pounds occasionally." (R. 71). Moreover, the hypothetical also was consistent with Plaintiff's own testimony that between June of 1998 and September 2003, he could lift at most five pounds, walk a half block, stand for five minutes, sit for 15-20 minutes, and had difficulty bending. (R. 48-49, 60).

In conclusion, Dr. Hausch's statements are consistent with the RFC and, to the extent there may be any inconsistency, such error was harmless in light of the more restrictive limitations the ALJ presented to the VE for a hypothetical worker, and upon which the ALJ based his determination at Step 5 that Plaintiff is capable of working.

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion to Reverse and Remand Commissioner's Decision [Doc. 15] is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: July 22, 2011

SHEILA FINNEGAN
United States Magistrate Judge